# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CLP TOXICOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0783-PRW |
| | ) | and |
| CASLA BIO HOLDINGS LLC, CASLA | ) | C.A. No. N18C-10-332 PRW |
| BIO GP, LLC, CASLA PARTNERS, L.P., | ) | CCLD |
| CASLA PARTNERS LLC, CASLA | ) | |
| PARTNERS CAPITAL FUND I, LP, | ) | |
| SAMUEL HINES, JARED ROCHWERG, | ) | |
| R2 INVESTMENTS, LLC a/k/a | ) | |
| SAMSON INVESTMENT PARTNERS, | ) | |
| HAWK CAPITAL PARTNERS, LP, | ) | |
| PROVCO VENTURES I, LP, CLIFTON | ) | |
| WRIGHT, ROY S. NEFF, LBCW | ) | |
| HOLDINGS, LP, CASLA ABS | ) | |
| INVESTORS, LP and LARRY HOLLIN, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: May 12, 2020
Decided:  June 29, 2020
Corrected: August 14, 2020

## MEMORANDUM OPINION AND ORDER

*Upon Defendants' Motion to Dismiss*,
**DENIED** in part; **GRANTED** in part.

Christopher Viceconte, Esquire, GIBBONS P.C., Wilmington, Delaware; Anthony J. Rospert, Esquire, Thomas M. Ritzert, Esquire, THOMPSON HINE LLP, Cleveland, Ohio, *Attorneys for Plaintiff CLP Toxicology, Inc*.

Peter B. Ladig, Esquire, Elizabeth A. Powers, Esquire, BAYARD, P.A., Wilmington, Delaware; Jordan D. Weiss, Esquire, GOODWIN PROCTER LLP, New York, New York, *Attorneys for Casla Bio Holdings LLC, Casla Bio GP, LLC,*

*Casla Partners, L.P., Casla Partners LLC, Casla Partners Capital Fund I, LP, Samuel Hines, Jared Rochwerg, R2 Investments, LLC A/K/A Samson Investment Partners, Hawk Capital Partners, LP, Provco Ventures I, LP, Clifton Wright, Roy S. Neff, LBCW Holdings, LP, Casla ABS Investors, LP And Larry Hollin.*

**WALLACE, J.**

This civil action arises out of Plaintiff CLP Toxicology, Inc.'s ("CLP") purchase of all Alternative Biomedical Solutions LLC's ("ABS" or the "Company") securities (the "Transaction") pursuant to a Securities Purchase Agreement (the "SPA"). CLP and Defendants Casla Bio Holdings LLC ("Casla" or "Company Seller"), and Casla Bio GP, LLC ("Blocker Seller" and, together with Casla, the "Seller Defendants") executed the SPA and closed the Transaction on December 18, 2017 (the "Closing" or "Closing Date").

CLP alleges that Samuel Hines, Jared Rochwerg (together, the "Individual Defendants"), and the Seller Defendants intentionally misled and induced CLP to purchase the assets based on omissions, concealments, and material misrepresentations.

CLP also asserts that Casla Partners, LP, Casla Partners LLC, Casla Partners Capital Fund I, LP (collectively, the "Principal Casla Defendants"), R2 Investments, LLC, a/k/a Samson Investment Partners ("R2"), Hawk Capital Partners, LP ("Hawk"), Casla ABS Investors, LP ("Casla ABS Investors" and, together with R2 and Hawk, the "Principal Investor Defendants"), the Seller Defendants, and Individual Defendants worked in confederation with one another to induce CLP to sign the SPA. CLP claims that the Seller Defendants and Individual Defendants acted at all relevant times as the agents of Principal Casla Defendants and the Principal Investor Defendants.

-1-

Finally, CLP asserts that the Seller Defendants transferred the proceeds of the sale of ABS to Provco Ventures I, LP ("Provco"), Clifton Wright, Roy Neff, LBCW Holdings, LP ("LBCW"), Larry Hollin (collectively, the "Investor Defendants") and the Principal Investor Defendants with intent to defraud CLP and prevent CLP from being able to recover the amounts owed to it as a result of the Seller Defendants' and Individual Defendants' fraudulent activities.

CLP filed parallel actions in the Court of Chancery (the "Court of Chancery Action") and the Complex Commercial Litigation Division of the Superior Court (the "Superior Court CCLD Action"), against the Seller Defendants, the Individual Defendants, the Principal Casla Defendants, the Investor Defendants and the Principal Investor Defendants (collectively, "Defendants"). Thereafter, the Chief Justice designated the undersigned to sit in the Court of Chancery Action so that one judicial officer could resolve the parties' overlapping and related disputes.[1]

In early 2019, CLP filed an amended complaint (the "Amended Complaint") in the Court of Chancery Action. CLP makes the following claims:

- Charges Fraudulent Inducement and seeks Damages against Seller Defendants and Individual Defendants ("Count I");

- Charges Fraudulent Inducement and seeks Rescissory Damages against Seller Defendants ("Count II");

---

[1]  *See* Del. Const. art. IV, § 13(2).

- Charges Fraud and seeks Damages against Seller Defendants and Individual Defendants ("Count III");

- Seeks Declaratory Judgment that Casla is an alter ego of the Principal Investor Defendants and the Investor Defendants ("Count IV");

- Seeks Declaratory Judgment that the Individual Defendants and Seller Defendants are agents of the Principal Investor Defendants and the Principal Casla Defendants ("Count V");

- Charges Breach of Section 4.21 of the SPA and seeks Damages against Seller Defendants ("Count VI");

- Charges Breach of Sections 4.6(b), 4.24, and 4.26 of the SPA and seeks Damages against Seller Defendants ("Count VII");

- Charges Breach of Sections 4.8, 4.15, and 4.17 of the SPA and seeks Damages against Seller Defendants ("Count VIII");

- Charges Breach of Section 9.1(c) of the SPA and seeks Damages against Seller Defendants ("Count IX");

- Charges Breach Section 4.26 of SPA and seeks Damages against Seller Defendants ("Count X");

- Seeks Unjust Enrichment/Disgorgement and Damages against Defendants, but in the alternative to Counts VI – X as to Seller Defendants Only ("Count XI");

- Charges Civil Conspiracy and seeks Damages against Seller Defendants, Individual Defendants, Principal Investor Defendants, and Principal Casla Defendants ("Count XII");

- Charges Fraudulent Transfer Under 6 *Del. C.* § 1301 et seq. and seeks Damages against All Defendants ("Count XIII");

- Seeks Constructive Trust and Damages against All Defendants ("XIV").

This is the Court's ruling on the Defendants' Rule 12(b)(6) motion to dismiss (the "Motion to Dismiss") Counts I-VIII, X, and XI of the Amended Complaint.

Having considered the record and the parties' arguments, the Court concludes that the Motion to Dismiss must be **DENIED** in part and **GRANTED** in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

Pursuant to the SPA, CLP purchased all of the issued and outstanding shares of the Company from Casla.[3]  The purchase price was based, in part, on the EBITDA generated by ABS.[4]

The SPA also includes a provision in which the Company Seller is deemed to have knowledge of facts that are within the actual knowledge of several key people. Under the terms of the Purchase Agreement "Company's Knowledge" is defined as "the actual knowledge, and the knowledge that could have been acquired with respect to any fact or matter had such individual made reasonable inquiry of or caused reasonable investigation by the Persons who would reasonably be expected

---

[2]  Unless otherwise noted, the facts recited herein are drawn from the well-pled allegations of the Amended Complaint, together with its attached exhibits.

[3]  Am. Compl. ¶ 53.

[4]  *Id*.

to have knowledge of such fact or other matter, of one or more of Simon Bergeron, Ray Fuller, Janet McGrath or Samuel Hines."[5]

## A. THE SPA.

### 1. The Pre-Closing Representations and Warranties Concerning the Company.

In Article IV of the SPA, the Company made several representations and warranties to CLP as of the Closing.[6]

In Section 4.21 of the SPA, the Company represented and warranted to CLP that its twenty (20) largest customers were named within Section 4.21(a) of the Disclosure Schedule ("Material Customers") and that "[n]o Material Customer . . . has within the twelve (12) months prior to the date of this Agreement ceased or materially altered its relationship with the Business, or, to Company's Knowledge, has threatened to cease or materially adversely alter any such relationship."[7]

In Section 4.24 of the SPA, the Company represented and warranted to CLP that its books and records were "maintained in accordance with commercially reasonable business practices and are complete and accurate in all material respects" and that Company "maintained a system of internal accounting controls sufficient to

---

[5]   *Id.* ¶ 54.

[6]   *Id.* ¶ 55; *see* Am. Compl., Exhibit A ("SPA") art. IV.

[7]   Am. Compl. ¶ 56; SPA § 4.21.

provide reasonable assurances that (i) transactions are executed in accordance with management's authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets, and (iii) access to assets is permitted only in accordance with management's authorization."[8]  In Section 4.6(b) of the SPA, the Company represented and warranted to CLP that "[t]he Financials (including any notes thereto) have been prepared in accordance with GAAP, consistently applied and fairly present, in all material respects, the consolidated financial position and results of the operations of the Group Companies in accordance with GAAP…."[9]

In Section 4.26 of the SPA, the Company represented and warranted to CLP that, other than certain accounts listed in the Section 4.26 Disclosure Schedule, "all of the accounts receivable" (a) "represent bona fide arm's length sales in the Ordinary Course of Business" and (b) "are collectible in the Ordinary Course of Business, less usual allowances for doubtful accounts provided for on the face of the Most Recent Balance Sheet."[10]

In Section 4.15(vi) of the SPA and Section 4.15 of the Disclosure Schedule, the Company identified "several pay or Compensation obligations . . . that would

---

[8]   Am. Compl. ¶ 57; SPA §4.24.

[9]   Am. Compl. ¶ 58; SPA § 4.6(b).

[10]   Am. Compl. ¶ 59; SPA § 4.26.

become payable by reason of the Contemplated Transactions" and that these obligations were not in "material breach."[11] And in Section 4.17(b)(ii) of the SPA, the Company represented and warranted that "no Group Company is delinquent in any payments to any Company Employee or Contingent Worker for any wages, salaries, commissions, bonuses, fees or other compensation due with respect to any services performed for it to the date hereof or amounts required to be reimbursed to such Company Employee or Contingent Worker."[12]

In Section 4.8 of the SPA, the Company represented and warranted to CLP that "[n]o Year 1 Earnout (as such term is defined in the Bergeron Employment Agreement) will be due and payable by any Group Company in accordance with, and subject to, the terms of the Bergeron Employment Agreement."[13]

The Company represented in Section 4.17(a)(ii) of the SPA that all independent contractors, consultants, temporary employees, leased employees or other servants or agents performing services for the Company and classified as other than a Company Employee were disclosed on the Section 4.17(a)(ii) Disclosure

---

[11] Am. Compl. ¶ 60; SPA § 4.15(vi).

[12] Am. Compl. ¶ 61; SPA § 4.17(b)(ii).

[13] Am. Compl. ¶ 62; SPA § 4.8.

Schedule.[14]  The Section 4.17(a)(ii) Disclosure Schedule required the Company to identify each Contingent Worker's fee or compensation arrangement.[15]

Section 4.32(a) of the SPA provides:

(a) NONE OF THE COMPANY, NOR OR ANY OF ITS REPRESENTATIVES, DIRECTORS, MANAGERS, PARTNERS, OFFICERS OR DIRECT OR INDIRECT EQUITYHOLDERS HAS MADE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER RELATING TO THE COMPANY, ANY OF ITS SUBSIDIARIES OR THE BUSINESS OF THE COMPANY, ITS SUBSIDIARIES OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY OF THE ASSETS OF ANY GROUP COMPANY OR ANY PROJECTION OR FORECAST RELATING TO ANY OF THEIR RESPECTIVE BUSINESSES), OTHER THAN THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE IV. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE CONDITION OF THE ASSETS OF THE GROUP COMPANIES SHALL BE "AS IS" AND "WHERE IS."[16]

Section 4.32(b) of the SPA provides:

(b) Without limiting the generality of the foregoing, except as expressly set forth in this Agreement, none of the Group Companies, nor any Affiliate of the Group Companies, nor any of their respective representatives, employees, officers, directors, managers, partners or direct or indirect equityholders, has made, and shall not be deemed to have made, any representations or warranties in the materials relating to the Business made available to the Buyer, including due diligence materials, or in any presentation of the Business by management of the Group Companies or others in connection with the Contemplated

---

[14]  Am. Compl. ¶ 63; SPA § 4.17(a)(ii).

[15]  *Id*.

[16]  SPA § 4.32(a).

Transactions, and no statement contained in any of such materials or made in any such presentation shall be deemed a representation or warranty hereunder and deemed to be relied upon by the Buyer or any of their Affiliates in executing, delivering and performing this Agreement and the Contemplated Transactions. It is understood that any cost estimates, projections or other predictions, any data, any financial information or any memoranda or offering materials or presentations, including any offering memorandum or similar materials made available by the Group Companies and their Representatives, are not and shall not be deemed to be or to include representations or warranties of any such Person, and are not and shall not be deemed to be relied upon by the Buyer or any of their Affiliates in executing, delivering and performing this Agreement and the Contemplated Transactions.[17]

## 2. CLP's Disclaimer of Other Representations and Warranties.

Article V sets forth CLP's representations and warranties. [18] Section 5.9(a) of

the SPA provides:

(a) NEITHER BUYER NOR ANY OF ITS REPRESENTATIVES, DIRECTORS, MANAGERS, PARTNERS, OFFICERS, EMPLOYEES OR DIRECT OR INDIRECT EQUITYHOLDERS HAS MADE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER RELATING TO BUYER OTHERWISE IN CONNECTION WITH THE CONTEMPLATED TRANSACTIONS, OTHER THAN THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE V.[19]

---

[17] SPA § 4.32(b).

[18] SPA art. V.

[19] SPA § 5.9(a).

Section 5.9(b) of the SPA provides:

The Buyer agrees to and acknowledges the disclaimers set forth in Section 4.32, Section 6.8 and Section 7.8.[20]

**3. Seller Defendants' Disclaimer of Other Representations and Warranties.**

Article VI of the SPA sets forth the Sellers' representations and warranties.[21]

Section 6.8(a) of the SPA provides that none of the Seller Defendants

HAS MADE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER RELATING TO SUCH SELLER, THE COMPANY, ANY OF ITS SUBSIDIARIES OR THE BUSINESS OF SUCH SELLER, THE COMPANY, ITS SUBSIDIARIES OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, OTHER THAN THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS Article VI.[22]

Section 6.8(b) of the SPA provides that none of the Seller Defendants

has made, and shall not be deemed to have made, any representations or warranties in the materials relating to the Business made available to the Buyer, including due diligence materials, or in any presentation of the Business by management of the Group Companies or others in connection with the Contemplated Transactions, and no statement contained in any of such materials or made in any such presentation shall be deemed a representation or warranty hereunder and deemed to be relied upon by the Buyer or any of their Affiliates in executing, delivering and performing this Agreement and the Contemplated Transactions. It is understood that any cost estimates, projections or other predictions, any data, any financial information or any

---

[20] SPA § 5.9(b).

[21] SPA art. VI.

[22] SPA § 6.8(a).

memoranda or offering materials or presentations, including any offering memorandum or similar materials made available by the Group Companies and their Representatives, are not and shall not be deemed to be or to include representations or warranties of any such Person, and are not and shall not be deemed to be relied upon by the Buyer or any of their Affiliates in executing, delivering and performing this Agreement and the Contemplated Transactions.[23]

Section 6.8(c) of the SPA provides that the Seller Defendants "agree to and acknowledge the disclaimers set forth in Section 5.9(a)."[24] Substantively identical language is used with respect to the representations of the Blocker and Blocker Seller in Section 7.8 of the SPA.

## 4. The Indemnification Clause.

Section 9.1(a) of the SPA provides CLP a remedy from the Seller Defendants, jointly and severally, for breaches of these representations and warranties: the Seller Defendants agreed to indemnify the Buyer Indemnified Parties, including CLP, for all Losses incurred, and continuing to be incurred by the Buyer Indemnified Parties as a result of "any breach of, or any misrepresentation with respect to, any representations and warranties set forth in Articles IV, VI or VII" as well as "any breach or violation of any covenant or agreement of such Seller contained in this Agreement."[25] Section 9.3(c) provides "notwithstanding anything to the contrary

---

[23]  SPA § 6.8(b).

[24]  SPA § 6.8(c).

[25]  Am. Compl. ¶ 64; SPA § 9.1.

- 11 -

herein, neither the Deductible nor the Cap shall apply to any Losses resulting from or arising out of (i) fraud…"[26]

**5. The Integration Clause.**

Section 10.5 of the SPA provides:

> This Agreement, together with the other Ancillary Agreements and any documents, instruments and certificates explicitly referred to herein, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto. There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for herein and therein.[27]

**B. SELLER DEFENDANTS' AND INDIVIDUAL DEFENDANTS' ALLEGED PRE-CLOSING MISREPRESENTATIONS.**

**1. Loss of Material Customers.**

In the Section 4.21(a) Disclosure Schedule, Defendants identified both ESA Laboratories ("ESA") and Maplewood Laboratories ("Maplewood") as Material Customers.[28]  Under Section 4.21, the Company represented that within twelve months prior to the Purchase Agreement, neither ESA nor Maplewood "ceased or

---

[26]  SPA § 9.3(c)

[27]  *Id*. § 10.5.

[28]  Am. Compl. ¶ 69.

materially altered its relationship with the Business or, to Company's Knowledge, has threatened to cease or materially adversely alter any such relationship."[29]

As of December 18, 2017—the Closing Date—neither ESA nor Maplewood were in operation, nor has either ever been able to restart their toxicology laboratories and begin processing clinical samples again.[30]  CLP alleges that the Seller Defendants and the Individual Defendants were aware that ESA and Maplewood were not operational at the time the SPA was executed.[31]

As to ESA, CLP alleges in detail that in September 2017, three months before the false representations were made in the SPA, ABS employees became aware of significant issues with ESA's operations—including that ESA was entering a two-week shutdown as a result of a negative business inspection—and were concerned that ESA might never be able to reopen.[32] They informed Rochwerg of their concerns.[33]

As to Maplewood, CLP alleges that in October of 2017, ABS employees learned of a dispute among Maplewood's ownership that led to a shutdown of

---

[29]   *Id.* ¶ 70.

[30]   *Id.* ¶ 112.

[31]   *Id.* ¶ 113.

[32]   *Id.* ¶¶ 75-81.

[33]   *Id.* ¶¶ 75-81, 87.

operations and loss of employees.[34] These facts too were communicated to Rochwerg.[35]

ABS employees met with Maplewood representatives in November of 2017 to discuss the lab's ongoing issues, the fact that Maplewood was not operational, and concern as to whether Maplewood would be able to pay ABS the current amount owing—which was in excess of $100,000.[36] Maplewood represented it needed short-term relief to restructure, and that it had hired consultants to assist.[37] These consultants asked ABS for a grace period and forgiveness of the amount owed, saying it was necessary to turn Maplewood around.[38]

## 2. Overstated Revenue and Financial Results.

In the Summer of 2017, Rochwerg directed ABS employees to secure as many equipment sales as possible to boost ABS revenues for the express purpose of showing a higher EBITDA in connection with the planned sale to CLP.[39] In August

---

[34] *Id.* ¶¶ 100-104.

[35] *Id.* ¶ 103.

[36] *Id.* ¶¶ 106-107.

[37] *Id.* ¶ 108.

[38] *Id.* ¶¶ 106-110.

[39] *Id.* ¶ 143.

- 14 -

2017, Radeas agreed to purchase $750,000 worth of equipment—a substantial purchase as ABS annual equipment sales were approximately $3,000,000.[40] But ABS employee Ray Fuller ("Fuller") felt it was more of a prospective deal, rather than an actual purchase, and so-informed Rochwerg.[41]

Rochwerg then instructed Fuller to invoice the Radeas sale. Because the order had not been fulfilled and no equipment had been shipped, the invoice was a violation of ABS's accounting policies and a process not in accordance with GAAP that overstated and deliberately inflated ABS's financial data.[42] Specifically, ABS policy provided that a customer would not be invoiced until the customer's order was fulfilled and the equipment shipped.[43]

Seller Defendants allegedly breached Sections 4.6(b), 4.24, and 4.26 through their invoicing of the Radeas sale.[44] CLP alleges that if it had known the real facts concerning the Radeas "sale" it either would not have proceeded with acquiring ABS or would have acquired it at a lower price.[45]

---

[40] *Id.* ¶¶ 145-146.

[41] *Id.* ¶¶ 147-148.

[42] *Id.* ¶¶ 150-154.

[43] *Id.* ¶ 142.

[44] *Id.* ¶ 155.

[45] *Id.* ¶ 154.

- 15 -

### 3. Understated Liabilities.

Seller Defendants also allegedly breached Sections 4.8, 4.15, and 4.17 of the SPA by: (i) breaching the Company's former Chief Executive Officer's Employment Agreement that entitled him to a $375,000 earn-out bonus payment; (ii) failing to pay $833,332.29 in consulting fees owed under a Consulting Agreement between ABS and the Company's founder, Cliff Wright—an amount in excess of what was specifically represented in the balance sheet as the only outstanding-balance-related liability; and (iii) understating the doubtful accounts receivable reserve (the "Accounts Receivable Reserve") in the amount of $605,201 because several accounts were not collectable in the Ordinary Course of Business.[46]

### C. SELLER DEFENDANTS', INDIVIDUAL DEFENDANTS', PRINCIPAL INVESTOR DEFENDANTS', AND PRINCIPAL CASLA DEFENDANTS' ALLEGED FRAUDULENT SCHEME.

CLP contends Seller Defendants, Individual Defendants, Principal Investor Defendants, and Principal Casla Defendants engaged in a fraudulent scheme to misrepresent and conceal the fact that two of the Company's Material Customers were not in business, operating, and processing customer samples at the time of the Closing Date.[47]

---

[46]  *Id.* ¶ 10.

[47]  *Id.*

Specifically, CLP alleges the Seller Defendants and the Individual Defendants actively discussed the true state of affairs with ABS's customer base.[48]  Internal emails and discussions between the Individual Defendants and ABS employees openly acknowledged the loss of two Material Customers.[49]

CLP alleges that Rochwerg directed Fuller to orchestrate the execution of a new contract with ESA, despite the fact that it was not operational, because any issues with the ESA account would be a potential issue for closing the transaction with CLP.[50]  Fuller did so, arranging for what appeared to be a 12-month renewal that, in fact, would likely be cancelled after just 90 days given the state of ESA's business.[51]  This contract was executed just seven days before the Closing of the transaction with CLP.[52]  Rochwerg, on behalf of Seller Defendants and Individual Defendants, designed a scheme to conceal the reality of ESA's and Maplewood's statuses, and directed ABS employees to take steps to prevent CLP from learning the true status of these accounts.[53]  For example, Rochwerg allegedly directed that a

---

[48]  *Id*. ¶ 7.

[49]  *Id*.

[50]  *Id*. ¶¶ 88-99.

[51]  *Id*. ¶ 94.

[52]  *Id*. ¶ 97.

[53]  *See id*. ¶¶ 114-136.

summary of ABS contracts be manipulated in a deceptive way to show a single start-and-end date range for all contracts, rather than the true specific start-and-end dates.[54]

In another incident, in advance of a meeting with lenders and CLP to discuss the status of certain accounts, Rochwerg instructed Fuller and another ABS employee not to volunteer information about ESA or Maplewood.[55] To the contrary, these employees were told to "stick to the script" that ESA and Maplewood were "still under contract" even though those labs were not operational. The employees were also told to deflect any questions seeking more specifics for contract dates beyond those listed in the manipulated, misleading summary.[56]

The Principal Investor Defendants and the Principal Casla Defendants are alleged to have acted as part of this scheme through their agents.[57] The Principal Investor Defendants collectively owned over 69% of the membership interest in Casla, and, according to CLP, at all relevant times, both dominated Casla and had the right to control the conduct of Seller Defendants, Hines, and Rochwerg.[58]

---

[54] *Id.* ¶¶ 119-123.

[55] *Id.* ¶¶ 123-125.

[56] *Id.* ¶ 127.

[57] *Id.* ¶ 13.

[58] *Id.*

R2 and Hawk each controlled at least one seat on Casla's board of directors.[59] The Principal Casla Defendants participated in this controlling block through Casla ABS Investors. And, it is alleged, Hines and Rochwerg: are each members, principals or officers of each of the Principal Casla Defendants; are each members of Casla's board of directors; and each actively participated in the management of Casla.[60]

**D. SELLER DEFENDANTS' TRANSFER OF SALE PROCEEDS TO THE PRINCIPAL INVESTOR DEFENDANTS AND INVESTOR DEFENDANTS.**

CLP also brings claims for unjust enrichment, fraudulent transfer, and constructive trust.[61] These claims arise from Seller Defendants alleged transfer of the ABS sales proceeds to the Principal Investor Defendants and the Investor Defendants with intent to defraud CLP and prevent CLP from being able to recover the amounts owed to it as a result of the Seller Defendants' and Individual Defendants' fraudulent activities.[62] Specifically, CLP alleges Casla: (i) transferred the ABS sale proceeds to the Principal Investor Defendants and the Investor Defendants who own, operate, and control Casla such that they are insiders under the Delaware Uniform Fraudulent Transfer Act ("DUFTA"); (ii) transferred ABS

---

[59] *Id.*

[60] *Id.*

[61] *Id.* ¶ 15.

[62] *Id.*

sale proceeds to the Principal Investor Defendants and the Investor Defendants despite knowing that its statements in the Purchase Agreement's representations and warranties were false so as to decapitalize itself and avoid paying the judgment that would ultimately be issued against it; and (iii) transferred substantially all of Casla's assets to the Principal Investor Defendants and the Investor Defendants, which rendered Casla severely undercapitalized in relation to its business, likely unable to pay CLP the amounts, and insolvent under the DUFTA.[63]

## II. PARTIES' CONTENTIONS

### A. CLP'S CLAIMS.

CLP sets forth fourteen counts in its Amended Complaint, twelve of which are disputed in the Motion to Dismiss.[64] In summary, Counts I, II, and III relate to the Seller Defendants' and Individual Defendants' omissions and misrepresentations of material facts in negotiations with CLP leading up to the Closing and in the Article IV representations and warranties. Count I seeks monetary damages for fraudulent inducement against Seller Defendants and Individual Defendants. Count II seeks rescissory damages for fraudulent inducement against Seller Defendants. Count III

---

[63] *Id.* ¶ 276.

[64] Defendants do not dispute the merits of Counts IX and XII. Still, Count XII for Civil Conspiracy depends on the survival of at least one of the fraud claims.

seeks monetary damages for fraud against Seller Defendants and Individual Defendants.

Counts IV and V seek declaratory judgement. Count IV seeks a declaration that Casla is merely an alter ego of the Principal Investor Defendants and Investor Defendants and therefore the corporate veil of Casla should be pierced. Count V seeks a declaration that Casla, Hines, and Rochwerg were acting as the agents of the Principal Investor Defendants and the Principal Casla Defendants and therefore the Principal Investor Defendants are jointly and severally liable for Casla, Hines, and Rochwerg's misconduct.

Counts VI, VII, VIII, and X seek damages from Seller Defendants for breach of contract. Count VI seeks monetary damages from Seller Defendants for failing to disclose the true status of the ESA and Maplewood accounts in violation of Section 4.21 of the SPA. Count VII seeks monetary damages for Seller Defendants' failure to disclose the true nature of the Radeas "sale" in violation of Sections 4.6(b), 4.24, and 4.26 of the SPA. Count VIII seeks monetary damages from Seller Defendants for failing to disclose the Bergeron earn-out bonus and the Cliff Right consulting fees in violation of Sections 4.8, 4.15. and 4.17 of the SPA. Count X seeks monetary damages for Seller Defendants' failure to disclose the true status of the Company's accounts receivable and the proper accounting thereof in violation of Section 4.26.

Count XI seeks monetary damages, disgorgement, and equitable relief for the unjust enrichment of all Defendants. In the alternative, CLP seeks monetary damages, disgorgement, and equitable relief for unjust enrichment of the Seller Defendants only.

Count XIII seeks monetary damages against all Defendants via DUFTA for fraudulent transfer of the proceeds realized from the Transaction to the Principal Investor Defendants and Investor Defendants. Finally, Count XIV seeks damages and equitable relief in the form of an order imposing a constructive trust over the proceeds of the transaction held by Defendants, including disgorgement of all proceeds readily traceable therefrom.

In their answering brief to Defendants' Motion to Dismiss, CLP argues that all Defendants are equitably estopped from challenging jurisdiction. Even so, CLP contends, there is jurisdiction over the Investor Defendants, Casla Partners LLC (collectively, "Non-Delaware Defendants") and the Individual Defendants and the exercise of such jurisdiction comports with due process. CLP says that the long-arm statute provides jurisdiction over the Non-Delaware Defendants and jurisdiction over the Individual Defendants is conferred by the Manager Consent Statute. Finally, CLP suggests it is entitled to jurisdictional discovery at a minimum.

**B. DEFENDANTS' MOTION TO DISMISS.**

Defendants contend (1) there is a lack of personal jurisdiction over the Non-Delaware Defendants and the Individual Defendants; and (2) Counts I-VIII, X, and XI fail to state cognizable causes of action.

Defendants first argue that the Non-Delaware Defendants are not equitably estopped from challenging jurisdiction. Defendants next argue that the Non-Delaware Defendants have taken no actions in Delaware sufficient to confer jurisdiction under the long arm statute and that the exercise of personal jurisdiction over the Non-Delaware Defendants does not comport with due process.

As for the Individual Defendants, Defendants contend that the Individual Defendants are not subject to jurisdiction under the Manager Consent Statute and that CLP did not serve the Individual Defendants under Delaware's Long-Arm Statute. Defendants further argue that CLP's conspiracy theory does not provide a basis for personal jurisdiction over the Individual Defendants.

With respect to Counts I, II, and III, Defendants allege that the anti-reliance language in the SPA bars CLP's fraud claims based on statements outside the four corners of the SPA. Defendants argue further that the fraud claims are duplicative of the breach-of-contract claims and should be dismissed. Defendants contend too that CLP has not pled sufficient facts to establish any fraudulent representation within the four corners of the SPA.

Defendants next argue that Count IV should be dismissed because CLP has not stated a claim for veil piercing against the Principal Investor Defendants and Investor Defendants. Defendants argue that Count V should be dismissed because CLP has not stated a claim under agency theory against the Principal Investor Defendants or the Principal Casla Defendants.

With respect to the breach claims in Counts VI, VII, VIII and X, Defendants argue that CLP cannot maintain a claim for breach of the SPA by the Seller Defendants. First, Defendants contend that the SPA bars any claims based on the Accounts Receivable Reserve and Mr. Wright's Consultancy Agreement. Second, Defendants argue that CLP's claim regarding the Bergeron Earnout are insufficient where CLP has not even alleged that Mr. Bergeron achieved it.

With respect to Count XI, Defendants claim that CLP's unjust enrichment/disgorgement claim should be dismissed on the merits. Defendants further suggest that CLP cannot assert unjust enrichment against non-parties to the SPA. Finally, Defendants contend that Counts XIII and XIV should also be dismissed on the merits.

# III. STANDARD OF REVIEW[65]

The Defendants' motion seeks to dismiss the Amended Complaint for failing to state a claim on which relief can be granted.[66] In Delaware, the pleading standards for purposes of a Rule 12(b)(6) motion "are minimal."[67] When considering a defendant's motion to dismiss, the Court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in the plaintiff's favor, and deny the motion unless the plaintiff

---

[65] While CLP—the party that decided to file simultaneous parallel suits in two of our trial courts—quibbles over whether the Court should apply the Court of Chancery Rules or the Superior Court Civil Rules here, it is mute as to whether there is any substantive difference between the two Court's rules or any operative difference in the analyses thereunder that must be engaged to decide this motion to dismiss. That's because there is nothing to say—there is no difference. *See* Ct. Ch. R. 12(b)(2), 12(b)(6); Del. Super. Ct. Civ. R. 12(b)(2),12(b)(6). *Compare Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (explicating standard applied under Chancery Rule 12(b)(2)), *with Economical Steel Building Technologies, LLC, v. E. West Construction, Inc.*, 2020 WL 1866869, at *2 (Del. Super. Ct. Apr. 14, 2020) (explicating that same standard as applied under Superior Court Civil Rule 12(b)(2)). *Compare also Matthew v. Laudamiel*, 2012 WL 605589, at *12 (Del. Ch. Feb. 21, 2012) (explicating standard applied under Chancery Rule 12(b)(6)), *with Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *2 (Del. Super. Ct. June 27, 2016) (explicating that same standard as applied under Superior Court Civil Rule 12(b)(6)). *And compare Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (setting forth Supreme Court's standard of review and spelling out the "well-settled" standards governing a motion to dismiss for failure to state a claim under Chancery Rule 12(b)(6)), *with Beck v. Brady*, 2004 WL 2154284, at *1 (Del. Sept. 20, 2004) (setting forth the Supreme Court's standard of review and spelling out those same "well-settled" standards governing a motion to dismiss for failure to state a claim under Superior Court Civil Rule 12(b)(6)). And so, the Court will wait until the point in this litigation when there is a meaningful distinction and when a decision to be made between the two courts' sets of rules is of moment.

[66] *See* Ch. Ct. R. 12(b)(6).

[67] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

could not recover under any reasonably conceivable set of circumstances susceptible of proof.[68] The operative test here is one of "reasonable conceivability."[69] This standard asks whether there is a "possibility" of recovery.[70] And Delaware's test is more lenient than the federal "plausibility" pleading standard, which invites judges to "'determin[e] whether a complaint states a plausible claim for relief' and 'draw on . . . judicial experience and common sense.'"[71] So this Court does not assess a claim's plausibility.[72]

When a defendant invokes Rule 12(b)(2) to seek a complaint's dismissal for lack of personal jurisdiction, "[t]he plaintiff has the burden to show a basis for the Court's jurisdiction over the nonresident defendant."[73] In determining whether a plaintiff has met its burden, the Court engages in a two-pronged inquiry: first, it must determine that service of process is authorized by statute, and "then [it] must determine that the exercise of jurisdiction over the nonresident defendant comports

---

[68] *Id.* (footnote omitted).

[69] *Id.* at 537 (footnote and internal quotation marks omitted).

[70] *Id.* at 537 n.13.

[71] *Id.* (alteration in original).

[72] *See Cambium Ltd. v. Trilantic Capital Partners III L.P.*, 2012 WL 172844, at *2 (Del. Jan. 20, 2012) ("The Court of Chancery erred by applying the federal 'plausibility' standard in dismissing the amended complaint.").

[73] *Terramar Retail Centers, LLC v. Marion #2-Seaport Trust U/A/D/ June 21, 2002*, 2017 WL 3575712, at *4 (Del. Ch. Aug. 18, 2017) (citation omitted).

with traditional due process notions of fair play and substantial justice."[74]  "The plaintiff has the burden to offer affirmative proof that these two steps are satisfied as to each defendant."[75]

## IV. DISCUSSION

### A. PERSONAL JURISDICTION.

### 1. There is Personal Jurisdiction Over the Individual Defendants.

Defendants argue that there is a lack of personal jurisdiction over the Individual Defendants, including under Section 18-109 of the Delaware Limited Liability Company Act, (the "LLC Manager Consent Statute").[76]  The LLC Manager Consent Statute authorizes personal jurisdiction over persons serving as managers of Delaware limited liability companies "in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company, or a violation by the manager . . . of a duty to the limited liability company or any member of the limited liability company, whether or not the manager . . . is a manager . . . at the time suit is commenced."[77]

---

[74]  *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[75]  *Hartsel v. Vanguard Group, Inc.*, 2011 WL 2421003, at *7 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012).

[76]  DEL. CODE ANN. tit. 6, § 18-109 (2018).

[77]  *Id.* at § 18-109(a).

So what is the scope of "involving or relating to the business of the limited liability company"?

Defendants contend this Court's *Hartsel v. Vanguard Group* decision answers that question. In *Hartsel*, the Court observed that an action involves or relates to the business of an LLC if:

> (1) the allegations against [the manager] focus centrally on his rights, duties and obligations as a manager of a Delaware LLC; (2) the resolution of this matter is inextricably bound up in Delaware law; and (3) Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions.[78]

And, the Court explained, "Delaware courts interpret the 'rights, duties and obligations as a manager of a Delaware LLC' to refer to rights, duties, and obligations a manager owes to his organization."[79]

CLP counters with our Supreme Court's more recent *Hazout v. Tsang Mun Ting* decision. In *Hazout*, the Supreme Court held that it may exercise personal jurisdiction over a non-resident officer or director of a Delaware corporation in *any* civil action in which the corporation is a party and the officer or director is a "necessary or proper party" under 10 *Del. C.* § 3114 (the "Corporate Director and

---

[78] *Hartsel*, 2011 WL 2421003, at *8 (citations omitted).

[79] *Id.* (quoting *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724 (Del. Ch. Dec. 1, 2009)).

Officer Consent Statute").[80] The Supreme Court overturned longstanding precedent that limited § 3114 personal jurisdiction over corporate directors and officers to actions involving alleged breaches of a fiduciary or statutory duty owed to the corporation or its stockholders by the non-resident officer or director.[81] The Supreme Court—relying on § 3114's plain language—abrogated this Court's *Hana Ranch, Inc. v. Lent*[82] (and its progeny) and conducted a *de novo* review of the Superior Court's interpretation of § 3114:

> In its analysis, the Superior Court acknowledged the effect *Hana Ranch* had of limiting the application of § 3114 to suits that involve claims of breach of a corporate fiduciary's duty. Being mindful of that constraint, the Superior Court strained to find jurisdiction over Hazout under the Internal Affairs Claim Provision. Even though the trial court acknowledged that Tsang did not allege that Hazout breached a duty that he owed in his official capacity, it determined that "the alleged misconduct would be adverse to Hazout's fiduciary duty to Silver Dragon." The Superior Court also observed that "Hazout acted in his corporate capacity as Silver Dragon's Director, President, CEO and Principal Financial and Accounting Officer when he transferred the money to his company, Travellers." On those grounds, the trial court determined that the Internal Affairs Claim Provision could be used to exercise jurisdiction over Hazout.[83]

---

[80] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 288-94 (Del. 2016).

[81] *Id.*

[82] 424 A.2d 28 (Del. Ch. 1980).

[83] *Hazout*, 134 A.3d at 283.

The Supreme Court said of the Superior Court's analysis:

> To our minds, it is counterproductive to embrace *Hana Ranch* and then create an incentive to read the Internal Affairs Claim Provision overbroadly. Rather, the historical view of the Court of Chancery that the Internal Affairs Claim Provision addressed only claims against nonresident fiduciaries of Delaware corporations for internal affairs claims involving an argument that they breached statutory or fiduciary duties they owed to the corporation or its stockholders is the correct one dictated by the language of that provision. In this case, Hazout is not being sued for having breached any duty he owed to Silver Dragon or its stockholders. He is being sued by Tsang for torts he allegedly committed against Tsang and the Investor Group in the course of negotiating on behalf of Silver Dragon and by using his powers at Silver Dragon to divert their funds to his affiliate.[84]

In short, the Supreme Court opted for a plain-language approach.[85] And thereunder, the Supreme Court found the Corporate and Officer Consent Statute conferred jurisdiction over Hazout to Delaware state courts.[86] It's noteworthy that the *Hartsel* test originates from *Hana Ranch's* reasoning,[87] the *Hazout* Court closely examined *Hana Ranch's* reasoning, and the *Hazout* Court then decidedly moved away from *Hana Ranch's* narrow approach.

---

[84]  *Id*. at 292.

[85]  *Id*. at 293-94.

[86]  *Id*.

[87]  *Hartsel*, 2011 WL 2421003, at *9 n.56 (citing *Assist Stock Management L.L.C. v. Rosheim*, 753 A.2d 974 (Del. Ch. 2000)); *Assist Stock Management*, 753 A.2d at 979-81 (citing *Hana Ranch*).

Although *Hazout* concerned the Corporate Director and Officer Consent Statute, this Court's decision last year in *Metro Storage International v. Harron* applied *Hazout* in the LLC context.[88]

In *Metro Storage*, this Court found the LLC Manager Consent Statute and the Corporate Director and Officer Consent Statute at issue in *Hazout* to be "comparable jurisdictional" statutes.[89] And so, *Metro Storage* convincingly explains, the history of the corporate director and officer consent statute equally supports allowing Delaware courts to exercise personal jurisdiction over key individuals who take action on behalf of an LLC.[90]

The Corporate Director and Officer Consent Statute originally applied only to directors, and provided Delaware courts no ability to exercise personal jurisdiction over senior officers.[91] Because this omission was problematic, the General Assembly eventually expressly extended § 3114 to senior officers.[92] But, as this Court observed in *Metro Storage*, the LLC Manager Consent Statute has avoided a

---

[88] *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *11 (Del. Ch. July 19, 2019).

[89] *Id.*

[90] *Id.* at *21.

[91] *See In re American International Group, Inc.*, 965 A.2d 763, 778 (Del. Ch. 2009); *Metro Storage,* 2019 WL 3282613, at *21.

[92] *See* DEL. CODE ANN. tit. 10, § 3114(b) (2019).

similar problem by always enabling a Delaware court to exercise personal jurisdiction over one who "participates materially" in the business of an LLC— regardless of that individual's title—for claims relating to his or her actions.[93]

It follows, therefore, that this Court should look beyond any individual's title and consider whether the alleged actions underlying the claims fall within the scope of the LLC Manager Consent Statute. Defendants argue here that *Hazout* should be limited only to corporate directors and officers. Defendants say "both pre- and post-*Hazout*, Delaware courts have consistently applied *Hartsel's* three-pronged due process analysis."[94] But the cases Defendants cite hardly support the broad propositions Defendants wish the Court to adopt—that *Hazout* must be limited only to corporate directors and officers and that in the LLC context a Delaware court must apply *Hartsel's* three-pronged due process analysis. Rather, those cases are examples of where *Hartsel's* due process analysis was applied to tort or contract claims unconnected to the internal affairs or corporate governance issues that Delaware law is concerned with.[95] The situation here is different and most akin to

---

[93] *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *21 (Del. Ch. July 19, 2019).

[94] Moving Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss ("Defs. Reply") at 6.

[95] *See, e.g.*, *CelestialRX Investments, LLC v. Krivulka*, 2019 WL 1396764, at *20 (Del. Ch. Mar. 27, 2019) ("The Plaintiffs' claims against Mazur during that time period deal with his duties and obligations as a director and manager of Akrimax."); *Baier v. Upper New York Investment Co. LLC*, 2018 WL 1791996, at *9 (Del. Ch. Apr. 16, 2018) ("[T]he alleged fraudulent scheme was commenced and completed prior to the existence of the LLC Defendants. It is inconceivable how Johny's alleged wrongdoing, which occurred prior to the formation of the LLC Defendants, arose

- 32 -

*Hazout*—that is, the specific claims against the Individual Defendants involve "actions in [their] official capacity of negotiating contracts that involved that change of control of a Delaware[-formed entity]."[96]

And so due process, in the context of the LLC Manager Consent Statute, is satisfied. The *Hazout* Court explained that, "[b]y becoming a director and officer of a Delaware corporation, Hazout purposefully availed himself of certain duties and protections under our law."[97] And, the Court found, "the claims against Hazout involve his actions in his official capacity of negotiating contracts that involved the change of control of a Delaware public corporation."[98] Here, the parties to the SPA

---

out of his rights, duties and obligations as manager of limited liability companies that were not yet in existence when the wrongdoing occurred. Moreover, the Complaint acknowledges that the LLC Defendants 'have no offices, no employees, and conduct no business.' Thus the claims at issue cannot possibly focus on Johny's rights, duties and obligations as manager of the LLC Defendants where, by Danny's own admission, there is nothing for Johny to do (or not do) as relates to these entities.") (citations omitted); *Republic Business Credit, LLC v. Metro Design USA, LLC*, 2016 WL 3640349, at *10 (Del. Super. Ct. June 29, 2016) ("[T]his case involves tort claims unconnected with the internal affairs of DE Metro Design."); *Wiggins v. Physiologic Assessment Services, LLC*, 138 A.3d 1160, 1165 (Del. Super. Ct. 2016) (finding employee failed to meet burden that claims concerning the nonresident CEO's duty to ensure employer compliance with employment laws were centrally focused on CEO's rights, duties, and obligations as manager); *Schweitzer v. LCR Capital Partners, LLC*, 2020 WL 1131716, at *6 (Del. Super. Ct. Mar. 9, 2020) (concerning a violation of a Connecticut wage laws between two Connecticut residents).

[96] *Hazout*, 134 A.3d at 293.

[97] *Id.* at 292; *see also LVI Group Investments, LLC v. NCM Group Holding, LLC,* 2018 WL 1559936, at *10 (Del. Ch. Mar. 28, 2018) (Exercising personal jurisdiction over individual defendant directors and officers of a Delaware corporation who had purposefully availed themselves of certain duties and protections under Delaware law by agreeing to serve as directors and officers of a Delaware corporation was "consistent with due process.").

[98] *Hazout*, 134 A.3d at 293.

agreed that Delaware law would govern and that any action arising out of the SPA would be brought in Delaware. So not one of the Individual Defendants can credibly suggest that he never foresaw that he would be subject to litigation in Delaware over his conduct.[99] The Court finds that there is jurisdiction over the Individual Defendants because they are alleged to have used their capacity as managers of Casla to commit the well-pled wrongs when negotiating contracts involving the change of control of ABS.

### 2. There is No Personal Jurisdiction Over the Non-Delaware Defendants.

CLP asserts Delaware's Long-Arm Statute, the alter ego theory of jurisdiction, the agency theory of jurisdiction, and the conspiracy theory of jurisdiction allow for this Court's exercise of personal jurisdiction over the Non-Delaware Defendants.[100] Defendants argue that CLP cannot obtain jurisdiction over the Non-Delaware Defendants under any theory.

---

[99]   *See Hazout*, 134 A.3d at 293-94.

[100] CLP's argument that Defendants are equitably estopped from challenging jurisdiction fails. As alleged, Non-Delaware Defendants' held positions as unit holders or limited parties and any benefits these non-Delaware Defendants received were indirect because they depended upon the acts of the managers of the respective entities to further distribute funds from the sale of ABS. And the mere contemplation of benefits is not sufficient to constitute a direct benefit. *See Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *4 (Del. Ch. Sept. 18, 2019), *reargument denied*, 2019 WL 5092894 (Del. Ch. Oct. 10, 2019).

All of these theories require CLP to plead an act within the state of Delaware sufficient to confer jurisdiction over the Non-Delaware Defendants.[101] In its answering brief, CLP provides a summary of the acts allegedly conferring jurisdiction:

> [t]hese acts, and their effects, involved no less than eight Delaware entities: two Delaware entities (Seller Defendants) made knowingly false representations in the Purchase Agreement to a third Delaware entity (CLP), who through the Purchase Agreement, governed by Delaware law with a Delaware forum selection clause, acquired a fourth Delaware entity (ABS). (*See generally* FAC). These fraudulent representations harmed a Delaware entity (CLP), yet benefited each of the co-conspirators, including six Delaware entities (Seller Defendants, Casla Partners, LP, Casla Partners Fund I, LP, and Principal Investor Defendants).[102]

Specifically, CLP alleges all Defendants "received substantial direct benefits from the Purchase Agreement and should reasonably have anticipated defending against lawsuits related to the Purchase Agreement in Delaware"[103] and "perpetuated and

---

[101] *See Mobile Diagnostic Grp. Holdings, LLC v. Suer*, 972 A.2d 799, 804 (Del. Ch. 2009) ("Under Delaware's long-arm statute, Delaware courts can exercise personal jurisdiction over a defendant for a claim that 'arises from' a 'jurisdictional act' enumerated in the statute."); *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *11 (Del. Ch. Sept. 2, 2008) ("The second common factor is that a successful showing of alter ego or agency does not necessarily mean that the principal or parent is subject to jurisdiction. As theories of indirect jurisdiction, the underlying question on both theories is whether the subsidiary's actions satisfy § 3104 of the long-arm statute."); *Istituto Bancario Italiano, SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210 (Del. 1982) (The third part of the five-part test for jurisdiction under the conspiracy theory requires a plaintiff to show "a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state.").

[102] CLP Ans. Br. at 23-24.

[103] Am. Compl. ¶ 38.

- 35 -

carried out the fraud and other misconduct alleged herein, which had effects in Delaware on CLP, which is a Delaware corporation."[104] CLP alleged that these Defendants transacted business in Delaware through their involvement with the Purchase Agreement, Casla, and ABS, out of which arise CLP's claims. Additionally, with respect to Casla Partners LLC, CLP alleged that it holds an equity interest in Casla ABS Investors and controls that entity.[105]

These alleged acts do not suffice to confer specific jurisdiction under either Section 3104(c)(1) of Delaware's Long Arm Statute or any of CLP's other alleged theories. Section 3104(c)(1) permits a Court to exercise jurisdiction over a non-resident Defendant that "[t]ransacts any business or performs any character of work or service in the State."[106] But "[b]ecause Section 3104(c)(1) constitutes a specific jurisdiction provision, it only allows jurisdiction over causes of action that are closely intertwined with the jurisdictional contact."[107] And none of the jurisdictional contacts suggested by CLP are so closely intertwined.

---

[104] *Id.* ¶ 40.

[105] Am. Compl. ¶ 46.

[106] DEL. CODE ANN. tit. 10, § 3104(c)(1) (2018).

[107] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *28 (Del. Ch. Jan. 25, 2013).

First, the holding of an interest in a Delaware entity is not an act in Delaware sufficient to confer specific jurisdiction.[108]  Second, a choice of law provision in a contract selecting Delaware law is not an act in the State of Delaware for purposes of conferring jurisdiction.[109]  Third, in Delaware, "[i]t is well established law that merely contracting with an entity that is incorporated within a forum state does not provide necessary connections between the contract and the forum to support a finding of jurisdiction."[110]  And lastly, "the passive receipt of income by defendants from debt and equity securities of Delaware companies does not constitute sufficient contacts with the state to support a finding of minimum contacts."[111]

CLP also alleges that there is jurisdiction because the "entire transaction revolved around Delaware and its corporate law."[112]  Relying on *Crescent/Mach I*

---

[108] *AeroGlobal Capital Management, LLC v. Cirrus Industries, Inc*., 871 A.2d 428, 439 (Del. 2005) ("We acknowledge that the ownership of a Delaware subsidiary does not, without more, amount to the transaction of business under Delaware's Long Arm Statute.").

[109] *Mobile Diagnostic*, 972 A.2d at 805.

[110] *Abajian v. Kennedy*, 1992 WL 8794, at *10 (Del. Ch. Jan. 17, 1992).

[111] *Hart Holding Co. Inc. v. Drexel Burnham Lambert Inc.*, 1992 WL 127567, at *5 (Del. Ch. May 28, 1992) ("The isolated act of investing in the shares of a Delaware corporation creates a foreseeable relationship with this state in only one respect: the law of Delaware will determine the nature of the rights thereby acquired. While that relationship is sufficient alone to support in *personam* jurisdiction in a narrow class of cases . . . it surely cannot support in *personam* jurisdiction for a general conspiracy and fraud claim.").

[112] CLP Ans. Br. at 24.

- 37 -

*Partners, L.P. v. Turner*,[113] CLP contends that with the transaction's focus on Delaware law and the transfer of a Delaware entity between Delaware entities, "a substantial act in furtherance of the plan . . . occurred in Delaware."[114] *Crescent/Mach*, however, centered on a merger that involved the formation of a Delaware entity and a filing with Secretary of State.[115] This Court has held "[t]he formation of a Delaware entity or the filing of a corporate instrument in Delaware to facilitate the challenged transaction satisfies this element."[116] But none of that's alleged here. CLP has not said the SPA required a specific filing with Delaware's Secretary of State, nor that a Delaware entity was formed as a result of the SPA. So the required close nexus is lacking in CLP's claims.[117]

CLP also argues that there is general jurisdiction over the Non-Delaware Defendants under Section 3104(c)(4) of Delaware's Long Arm Statute. Section 3104(c)(4) provides for personal jurisdiction over non-resident defendants if the defendant causes tortious injury within or outside Delaware from an act or omission

---

[113] 846 A.2d 963, 977 (Del. Ch. 2000) (merger between Delaware corporations under Delaware corporate law was a substantial act in furtherance of the conspiracy).

[114] CLP Ans. Br. at 24.

[115] *Crescent/Mach*, 846 A.2d at 977.

[116] *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1198 (Del. Ch. 2010).

[117] *See LVI Grp. Invs., LLC v. NCM Group Holdings, LLC*, 2017 WL 3912632, at *5 (Del. Ch. Sept. 7, 2017) ("To confer jurisdiction, the transaction of business must have a 'tight nexus' to the cause of action and must 'form a source of the claim.'").

outside of the State if the defendant "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State[.]"[118]  "Specifically, subsection (c)(4) jurisdiction arises only 'when a defendant has had contacts with this state that are so extensive and continuing that it is fair and consistent with state policy to require that the defendant appear here and defend a claim.'"[119] CLP claims this element is satisfied because (1) each of the Investor Defendants holds an equity interest in Casla;[120] (2) Casla Partners LLC's sole member is Hines, whom Plaintiffs have alleged controlled and dominated ABS;[121] (3) Casla entities are closely related and share overlapping management and ownership;[122] (4) Casla Partners LLC had an advisory services agreement with ABS;[123] and (5) CLP's injury arises out of the

---

[118]  DEL. CODE ANN. tit. 10 § 3104(c)(4) (2018).

[119]  *Comput. People, Inc. v. Best Int'l Grp., Inc.*, 1999 WL 288119, at *7 (Del. Ch. Apr. 27, 1999); *see also HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300, 310 (Del. Ch. 1999) ("The[] conditions [of Section 3104(c)(4)] are rigorous and require a showing of substantial and continuous activity in Delaware.").

[120] *See* Am. Compl. ¶¶ 22, 24, 30-34.

[121]  *See id.*

[122]  CLP Ans. at 20.

[123]  *Id*.

Investor Defendants' and Casla Partners LLC's fraud, which is related to their investments in Delaware.[124]

A non-resident's ownership interest in a Delaware entity, without more, does not provide a basis for the "persistent course of conduct in [Delaware]" required for general jurisdiction.[125] The *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.* case that CLP cites is inapposite.[126] In *Altech* the federal district court recognized general jurisdiction where: the defendant corporation acquired the stock of a Delaware co-defendant as a result of a merger under Delaware law; the majority of defendant's subsidiaries were Delaware corporations; the defendant corporation regularly filed and recorded corporate documents with Delaware's Secretary of State; the defendant corporation used a Delaware-based corporation trust company as its agent; and the defendant corporation regularly employed Delaware corporation law to merge its subsidiaries.[127] CLP has alleged neither the formation of a company in Delaware nor any filing with the Secretary of State as the result of the Transaction.

Because CLP has not even made a prima facie case for personal jurisdiction over the Non-Delaware Defendants, jurisdictional discovery is also denied. "If a

---

[124] Am. Compl. ¶ 40.

[125] *Conn. Gen. Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *3 (Del. Ch. Oct. 28, 2011).

[126] 542 F. Supp. 53 (D. Del. 1982).

[127] *Id*. at 55.

plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the parties] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained."[128]   But jurisdictional discovery is not appropriate until there is demonstration of a non-frivolous ground for jurisdiction.[129]

Given the dearth of factual allegations, CLP cannot use jurisdictional discovery to simply "fish for a possible basis for this court's jurisdiction."[130]  No, the Court must determine whether certain discovery avenues, "if explored, might provide the 'something more' needed" to establish personal jurisdiction.[131] To merit jurisdictional discovery, plaintiffs show that their factual allegations establish with reasonable particularity the possible existence of requisite contacts.  Yet, CLP does not explain how discovery would provide the "something more" needed to establish personal jurisdiction.  And CLP has failed to establish with requisite particularity any act in Delaware sufficient to confer jurisdiction.

---

[128] *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

[129] *In re Am. Int'l Gp.*, 965 A.2d at 831 n.195 (Del. 2011).

[130] *Id*.

[131] *Toys "R" Us*, 318 F.3d at 456.

Jurisdictional discovery will not change the documents governing the Transaction nor will it create new contacts sufficient to confer jurisdiction over the Non-Delaware Defendants. Accordingly, all claims against the Non-Delaware Defendants must be dismissed.

## B. CLP'S FRAUD CLAIM SURVIVES.

Defendants argue that the Court should dismiss the fraud claim because it is barred by the SPA's anti-reliance language and integration provision. According to Defendants these provisions bar CLP from claiming it reasonably relied on any alleged misrepresentations or omissions outside of those representations and warranties specified in the SPA.

### 1. The non-reliance provision limits fraud claims to written representations in the SPA.

Article IV of the SPA sets forth the Company's representations and warranties. Defendants rely on the non-reliance and integration provisions in Sections 4.32, 5.9, 6.8, 7.8 and 10.1 of the SPA to make its argument. Section 4.32 provides:

> Without limiting the generality of the foregoing, except as expressly set forth in this Agreement, none of the Group Companies, nor any Affiliate of the Group Companies, nor any of their respective representatives, employees, officers, directors, managers, partners or direct or indirect equity holders, has made, and shall not be deemed to have made, any representations or warranties in the materials relating to the Business made available to the Buyer, including due diligence materials, or in any presentation of the Business by management of the Group Companies or others in connection with the Contemplated

Transactions, and *no statement contained in any of such materials or made in any such presentation shall be deemed a representation or warranty hereunder and deemed to be relied upon by the Buyer* or any of their Affiliates in executing, delivering and performing this Agreement and the Contemplated Transactions. *It is understood that any cost estimates, projections or other predictions, any data, any financial information or any memoranda or offering materials or presentations, including any offering memorandum or similar materials made available by the Group Companies and their Representatives, are not and shall not be deemed to be or to include representations or warranties of any such Person, and are not and shall not be deemed to be relied upon by the Buyer or any of their Affiliates in executing, delivering and performing this Agreement and the Contemplated Transactions.*[132]

Substantively identical language is used with respect to the representations of the Company Seller and Blocker Seller in Section 6.8[133] and the Blocker and Blocker Seller in Section 7.8.[134]  In Section 5.9(b) of the SPA, CLP represented that "[t]he Buyer agrees to and acknowledges the disclaimers set forth in Section 4.32, Section 6.8 and Section 7.8."[135]  Section 10.1 is a standard integration clause that should not be considered a non-reliance provision.[136]

---

[132]  SPA § 4.32(b) (emphasis added).

[133]  *See id*. § 6.8.

[134]  *See id.* § 7.8.

[135]  *Id*. § 5.9(b).

[136] *See Novipax Holdings LLC v. Sealed Air Corp*., 2017 WL 5713307, at *12 (Del. Super. Ct. Nov. 28, 2017).

CLP claims Defendants' argument ignores the fact that CLP's fraud claims (Counts I, II, and III) are based on fraudulent statements in the SPA's representations and warranties and that a fraud claim can be based on a purchase agreement's representations and warranties. Additionally, CLP claims that even if CLP were relying on extra-contractual statements, the SPA "specifically preserved the right to pursue a legal remedy for fraud," which demonstrates that the parties did not intend to wholly disclaim reliance on intentional fraud made outside the parameters of the SPA's representations and warranties.[137] CLP cites Section 9.3(c) to show that the parties expressly preserved CLP's right to seek relief outside of the provisions set forth in the Purchase Agreement for claims of fraud.[138]

CLP relies on *Anvil Holding Corp. v. Iron Acquisition Co. Inc.* to argue that its fraud claim is cognizable in spite of the non-reliance provisions.[139] In *Anvil*, this Court refused, for two reasons, to dismiss a fraud claim when the defendant resorted to the non-reliance provisions of the subject agreement.[140] First, the *Anvil* court found that the non-reliance provisions did not unambiguously demonstrate that both

---

[137] *See* CLP Ans. Br. at 38 (quoting *Anvil Holding Corp. v. Iron Acquisition Co. Inc*, 2013 WL 2249655, at *1 (Del. Ch. May 17, 2013)).

[138] CLP Ans. Br. at 39; *see* § 9.3(c) ("Notwithstanding anything to the contrary herein, neither the Deductible nor the Cap shall apply to any Losses resulting from or arising out of (i) fraud . . .").

[139] 2013 WL 2249655.

[140] *Id*. at *8.

parties disclaimed reliance on extra-contractual statements. Second, the *Anvil* court found that the "exclusive remedies" clause, in which the parties agreed to reserve all rights to claims based on fraud, preserved the fraud claim.[141] The exclusive remedies provision thus provided further evidence that the parties intended that fraud claims could be based on extra-contractual representations.[142]

Similar to *Anvil*, the parties included an exclusive remedies provision and expressly provided that fraud claims were reserved. Unlike *Anvil*, the Company, the Seller Defendants, and CLP expressly represented in Sections 4.32, 5.9, 6.8, and 7.8 that they were not relying on any extra-contractual representations. Still, the fraud claims may proceed based on the written representations in the SPA. As in *Novipax Holdings v. Sealed Air Corp.*, both parties had disclaimed reliance and also included an exclusive remedies provision that expressly reserved fraud claims.[143] The Superior Court there explained "the non-reliance provision likely places a limit on the types of fraud claims that can be brought to those based on written representations in the APA . . . when drafters specifically preserve the right to assert

---

[141] *Id.*

[142] *Id.*

[143] 2017 WL 5713307, at \*12.

fraud claims, they must say so if they intend to limit that right to claims based on written representations in the contract."[144]

While Defendants read otherwise, the language in the SPA does not warrant dismissal of CLP's fraud claim. At this stage of the proceedings, the Court finds that the parties preserved a fraud claim in Section 9.1(c), but limited that fraud claim through the non-reliance provisions in Section 4.20 and 5.7 to written representations in the SPA. As alleged, the representations relied upon are intra-contractual. Throughout paragraphs 69-155 of the Amended Complaint, however, CLP appears to be relying on extra-contractual misrepresentations and omissions.[145] To the extent that CLP is relying on extra-contractual misrepresentations and omissions, those are barred by the non-reliance provisions.

## 2. The fraud claim is pled with the requisite particularity.

Defendants also attack the fraud claim with suggestions that it (1) is not pleaded with particularity and (2) alleges no damages separate from the breach-of-contract damages. As to the first argument, it is abundantly clear that the Amended Complaint pleads fraud with the requisite particularity. In general, the Amended Complaint alleges that: Defendants made material misrepresentations, CLP

---

[144] *Id.*

[145] *See* Am. Compl. ¶¶ 69-155.

justifiably relied on those misrepresentations, Defendants knew the representations were false or made them recklessly and with the intent to deceive CLP, CLP was fraudulently induced into the transaction, and CLP suffered damages as a result.

As to the second argument, CLP asserts separate claims for fraud that are not duplicative of its breach-of-contract claims. For example, the Individual Defendants—who actively engaged in the fraud alleged in the Amended Complaint—are not parties to the SPA and therefore the damages for fraud asserted against them are not duplicative of any breach-of-contract claim. Counts I and III, therefore, cannot be dismissed as against the Individual Defendants.

"Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action."[146] The damages allegations, however, may not simply rehash the damages allegedly caused by breach of contract.[147] Moreover, plaintiff cannot "bootstrap a claim of breach of contract into a claim for fraud by alleging that a contracting party never intended to perform its obligations."[148]

---

[146] *Cornell Glasgow, LLC v. La Grange Props. LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012) (quoting *Dalton v. Ford Motor Co.*, 2002 WL 338081, at *6 (Del. Super. Ct. Feb. 28, 2002)).

[147] *Id*. at *8-9 (dismissing a fraud claim because the plaintiffs' damages allegation was nothing more than a "rehash" of the allegations in its breach of contract claims).

[148] *Id*. at *8.

It appears that the principal claim in the Amended Complaint is for fraud and fraudulent inducement, which would render the SPA void. And the breach-of-contract claim, on the facts presented here, is a valid alternative pleading for remedy.[149] CLP alleges that it obtained contractual representations and covenants to ensure that the Business, including stability of customers, still existed at the Closing. CLP, however, purportedly misrepresented and concealed information regarding Material Customers and its Radeas equipment sales, in order to induce CLP into the SPA. These allegations, if true, go beyond a mere intention not to comply with the terms of the Agreement. As such, at this juncture, the fraud claim is sufficiently different from the breach-of-contract claim.[150]

While the two claims are different, Defendants are correct that CLP pleads damages that on their face are similar for both claims. But CLP prays for rescission of the transaction or rescissory damages, which is a remedy for fraud. This Court has held that a claim for rescission or rescissory damages separates a fraudulent

---

[149] *See The Anschutz Corp. v. Brown Robin Capital, LLC,* 2020 WL 3096744, at \*15 (Del. Ch. June 11, 2020) (Noting that "[a]s a general rule, the bootstrapping bar makes perfect sense. When a party claims he was fraudulently induced into entering a contract by promises that were then included in the negotiated language of that very contract, his remedy should be in contract, not tort . . . . [But w]hile our courts do not hesitate to dismiss bootstrapped fraud claims, our courts also recognize that the bootstrap rule is not absolute.").

[150] *Id.*

inducement claim from breach-of-contract damages.[151] Nonetheless, if discovery demonstrates that CLP's damage claims for breach of contract and fraud are the same, the Court can revisit the issue prior to a trial.

## C. FRAUDULENT INDUCEMENT.

A fraud claim can be based on representations found in a contract.[152] But the allegations of fraud must be separate from the breach-of-contract claim.[153] And "[a]llegations that are focused on *inducement* to contract are 'separate and distinct' conduct."[154]

CLP's allegations rely on the representations, warranties, and covenants contained in Sections 4.6(b), 4.21, 4.22, and 4.24. Under these sections, the Individual Defendants and Seller Defendants represented, warranted, and covenanted to make certain disclosures regarding its Business prior to the Closing. For example, In Section 4.21(a), the Company represented that "[n]o Material

---

[151] *See Abry,* 891 A.2d at 1064; *see also 3M Co. v. Neology, Inc.,* 2019 WL 2714832, at *14 (Del. Super. Ct. June 28, 2019) (holding that fraud claim was not impermissibly bootstrapped where plaintiff was seeking rescissory damages, "which are a remedy for fraud, not breach of contract"); *Firmenich Incorporated v. Natural Flavors, Inc.,* 2020 WL 1816191, at *10 (Del. Super. Ct. Apr. 7, 2020).

[152] *ITW Global Investments. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908, at *6 (Del. Super. Ct. June 24, 2015) (quoting *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *4 (Del. Super. Ct. Apr. 16, 2014)).

[153] *Id.*

[154] *Id.*

Customer . . . has within the twelve (12) months prior to the date of this Agreement ceased or materially altered its relationship with the Business, or, to Company's Knowledge, has threatened to cease or materially alter any such relationship."[155] Despite this representation and warranty, Seller Defendants and Individual Defendants actively and intentionally concealed that two of the customers they identified as a Material Customers, ESA and Maplewood, were no longer operational, and had therefore "ceased or materially altered [their] relationship with the Business or, to Company's Knowledge, ha[d] threatened to cease or materially adversely alter any such relationship."[156] Seller Defendants therefore fraudulently represented in the representations and warranties of the SPA that ESA and Maplewood had not altered their relationship with ABS in the twelve months preceding the date of the Agreement. These are not extra-contractual statements on which CLP disclaimed reliance.

The same is true with the fraud concerning the Radeas transaction. The Company represented and warranted that its book and records were "maintained in accordance with commercially reasonable business practices and are complete and accurate in all material respects," that the Company "maintained a system of internal

---

[155] Am. Compl. ¶ 56 & SPA § 4.21(a).

[156] *Id.* ¶¶ 69-137.

accounting controls . . . " and that its Financials were prepared in accordance with GAAP.[157] Nonetheless, Seller Defendants and Individual Defendants directed ABS employees to improperly book sham equipment sales to Radeas in order to inflate ABS's EBITDA and inflate the amount CLP paid for ABS.[158] This fraud is based on CLP's reliance on the representations and warranties expressly set forth in the SPA.

The facts of this case are similar to both *Novipax*[159] and *Abry*.[160] In *Novipax*, the plaintiff, the buyer of the company, relied on representations in the subject asset purchase agreement about how the defendant was to conduct the business and about the financial viability of the business before the closing, including the business's major customers.[161] However, after the parties closed the transaction, the plaintiff learned that those representations were false, and that defendant did not correct the misrepresentations before the closing in an attempt to induce the plaintiff into closing the transaction.[162] The Superior Court found this sufficient to support a claim

---

[157] *Id.* ¶¶ 57-58.

[158] *Id.* ¶¶ 138-155.

[159] 2017 WL 5713307, at *13 (Del. Super. Ct. Nov. 28, 2017).

[160] 891 A.2d 1032.

[161] *Novipax*, 2017 WL 5713307, at *13.

[162] *Id.*

for fraudulent inducement at the initial pleading/motion to dismiss stage of the litigation.[163] Similarly, CLP alleges that after the transaction closed, it learned of Defendants' misrepresentation concerning the operational state of two material customers—a misrepresentation that Defendants never sought to correct before the Closing—and a misrepresentation made and continued in an attempt to induce CLP into closing the transaction.[164]

In *Abry*, the parties entered into a purchase agreement for the buyer's purchase of a portfolio company.[165] The purchase agreement contained several representations and warranties about the company's financial statements.[166] After the parties entered into the purchase agreement, the buyer discovered that the financial statements prior to the purchase agreement were fraudulently manipulated by the seller.[167] This Court refused to dismiss the fraudulent inducement claim, finding that the "financial statements were represented and warranted in the Agreement and were therefore intended to induce the Buyer to sign the Agreement and close the sale to purchase the Company."[168] Similarly, CLP claims Defendants

---

[163] *Id.*

[164] Am. Compl. ¶¶ 70-74, 189, 198.

[165] *Abry*, 981 A.2d at 1034-35.

[166] *Id.*

[167] *Id.* at 1038-40.

improperly booked sham equipment sales to Radeas to inflate ABS's EBITDA and the amount CLP paid for ABS. Accordingly, CLP has pled facts sufficient to support a claim for fraudulent inducement at this stage in the litigation.

## D. BREACH OF CONTRACT.

Defendants next seek to dismiss the breach-of-contract claims. CLP has alleged that Seller Defendants breached Sections 4.6(b), 4.8, 4.15, 4.17, 4.21, 4.22, and 4.24. Defendants first argue that all of the Article IV representations and warranties alleged to be breached are only representations by the Company, not the Seller Defendants. Second, Defendants contend that CLP has not alleged any facts that demonstrate that Seller Defendants breached any provision of the SPA.

Defendants' first argument is a technical one. Defendants are correct that the Company is the only party specifically named to make the representations and warranties concerning the group of companies in Article IV.[169] Before analyzing the particular language of the SPA, is important to look at the SPA in context. In *Abry*, the Court analyzed the stock purchase agreement's terms in light of the seller's relationship with the company that was sold:

> Both the Seller and the Buyer are private equity firms. The Company was a portfolio company of the Seller. That meant that the Seller had an intense interest in its value and in keeping with that, the Seller had

---

[168] *Id.* at 1051.

[169] *See* SPA art. 4.

- 53 -

assigned key personnel, specifically Dominguez, to monitor the performance of the Company and interact with the Company's management during the sale. But that did not necessarily mean that the Seller knew the Company in the same intimate manner that the Company's managers did. The managers had no prior affiliation with the Seller, and like any other private equity firm, the Seller was as much a monitor of, as a partner with, the Company's management.

In view of this common context, it is not surprising that the Stock Purchase Agreement's terms recognized a distinction between the Seller and the Company and gave this distinction importance in addressing questions relating to liability. The Agreement did not conflate the Seller with the Company and make it responsible for everything the Company and the Company's management did or said. Rather, the Seller only accepted responsibility for the Company's actions and words to the extent set forth in the Agreement and the required Officer's Certificate. Nothing about that arrangement is novel to anyone with any rudimentary familiarity with negotiated acquisition agreements, particularly those involving private equity firms.[170]

The business context of *Abry* is significantly different from the circumstances of this case. CLP claims that the Company made the representations under the control and direction of the Seller Defendants and the Individual Defendants. Specifically, CLP alleges Sellers should be liable because: (1) Rochwerg signed the Purchase Agreement on behalf of ABS and the Seller Defendants; (2) Rochwerg, who held the same assortment of titles of VP, Secretary, and or Treasurer for ABS and the Seller Defendants,[171] controlled the disclosures, representations and

---

[170] *Abry,* 981 A.2d at 1040-41.

[171] *See* Am. Compl., Ex. A at signature pages.

warranties made by ABS in connection with CLP's acquisition; and (3) Seller Defendants expressly agreed to indemnify CLP for any breaches of Article IV regardless of which party actually made the representations.[172] Under the well-pled standard of a motion to dismiss, even vague allegations in the Complaint are well-pled if Defendants were provided notice of the claim.[173] Even if the Seller Defendants are liable only for indemnification of the Company's violations of Article IV, the Court will not dismiss CLP's claims merely because the Amended Complaint "does not invoke the word 'indemnification.'"[174] CLP's breach-of-contract claims provide notice of the claim, even if it does not explicitly state it seeks indemnification under Section 9.1.[175] These allegations are sufficient to show that the Seller Defendants should be liable for violations of Article IV.

As for the second argument, this Court need not address whether there was a breach of the SPA. CLP's claim against the Seller Defendants is based on their violations of Sections 4.6(b), 4.8, 4.15, 4.17, 4.21, 4.22 and 4.24.[176] For the present

---

[172] CLP Ans. Br. at 52.

[173] *See Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at *5 (Del. Ch. May 30, 2014).

[174] *Id*.

[175] *Id*; *see also Anvil*, 2013 WL 2249655, at *9 (finding buyer had stated a claim against sellers for the company's breaches of the purchase agreement because the sellers had agreed to indemnify the buyer for the company's breach).

[176] *See* Am. Compl. ¶¶ 160-161, 164-178, 239-244, 249-253.

motion, the Court must accept all well-pleaded allegations as true. The Court must construe these allegations and the inferences to be drawn therefrom in the light most favorable to CLP. In doing so, the Court finds that the allegations, if true, support a claim for breach of contract, specifically. Therefore, the Court will not dismiss the breach-of-contract claims.

### E. FRAUDULENT TRANSFER.

CLP asserts fraudulent transfer claims against all of the defendants except the Seller Defendants because they allegedly are the transferees of the proceeds that were fraudulently transferred to them with the debtor's actual intent to hinder, delay, or defraud. Defendants argue that CLP must prove that each defendant alleged to have fraudulently transferred proceeds of the fraudulent transaction is a debtor under DUFTA and that each transferred proceeds with the intent to hinder, delay, or defraud CLP.

But under DUFTA's plain language, a plaintiff may bring an action to avoid a transfer or attach the "asset transferred or other property of the *transferee*."[177] And CLP does not need a judgment against the Seller Defendants in order to pursue claims for fraudulent transfer against transferees. Because under DUFTA, a

---

[177] DEL. CODE ANN. tit. 6, § 1307(a)(1) & (2) (2018) (emphasis added).

"debtor" is one who is "liable on a claim."[178] And a claim "means a right to payment, *whether or not the right is reduced to judgment*."[179]

Defendants also argue CLP must show that Seller Defendants transferred their assets to the remaining Defendants with "actual intent to hinder, delay or defraud any creditor."[180] CLP has asserted allegations sufficient to state a claim for fraudulent transfer. Specifically, CLP alleges the following: (1) Seller Defendants transferred their assets "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due";[181] (2) Seller Defendants transferred assets "without receiving a reasonably equivalent value in exchange for the transfer or obligation" and were "insolvent at that time or the debtor became insolvent as a result of the transfer";[182] and (3) Seller Defendants' "transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable

---

[178] *Id.* at § 1301(6).

[179] *Id*. at § 1301(3) (emphasis added).

[180] *Id.* at § 1304(a)(1).

[181] *Id.* at § 1304(a)(2); Am. Compl. ¶¶ 276, 278-279.

[182] DEL. CODE ANN. tit. 6, § 1305(a) (2018); Am. Compl. ¶¶ 276, 278-279.

- 57 -

cause to believe the debtor was insolvent."[183]  CLP's allegations are sufficient to survive Defendants' motion to dismiss.[184]

## F. UNJUST ENRICHMENT.

Defendants argue that CLP has failed to state a claim for unjust enrichment against all Defendants.  As to the Seller Defendants, Defendants argue that CLP cannot recover for disgorgement based upon unjust enrichment because CLP does not allege anywhere that there was not a valid and enforceable agreement governing the subject of this dispute. Defendants are correct in arguing that CLP cannot maintain both a cause of action for breach of contract and unjust enrichment. However, breach of contract and an unjust enrichment claim may survive a motion to dismiss when pled as alternative theories of recovery.[185]  CLP has adequately alleged unjust enrichment as an alternative theory of recovery here.  If the principal claim in this case is for fraud and fraudulent inducement and the fraudulent inducement renders the SPA void, then a claim for unjust enrichment may thus

---

[183]  DEL. CODE ANN. tit. 6, § 1305(b) (2018); Am. Compl. ¶¶ 276, 278-279.

[184]  *See* Am. Compl. ¶¶ 276-280.

[185]  *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp*., 2009 WL 264088, at *8 (Del. Ch. Feb. 3, 2009) ("In some instances, both a breach of contract and an unjust enrichment claim *may* survive a motion to dismiss when pled as alternative theories for recovery.") (emphasis in original); *Yu v. GSM Nation, LLC*, 2018 WL 2272708, at *21 (Del. Super. Ct. Apr. 24, 2018) ("In some cases, however, both a breach of contract and an unjust enrichment claim *may* survive a motion to dismiss when pled as alternative theories of recovery.") (emphasis in original).

proceed under the theory that no valid contract exists. Therefore, the Court will not dismiss the unjust enrichment claim, but CLP must eventually decide under what theory it wishes to proceed—fraud and unjust enrichment or breach of contract.

As to the remaining moving defendants, Defendants argue that CLP does not state a claim for unjust enrichment because only the Seller Defendants signed the SPA. Although non-signatories generally cannot be bound by the terms of a contract,[186] CLP has alleged that the non-parties to the contract owed a duty arising out of tort rather than contract.[187] Specifically, CLP has alleged that the non-signatory related parties engaged in scheme to defraud CLP and received benefits resulting from that fraud.[188] These allegations are separate and independent from the fact that the Seller Defendants breached the SPA and are thus sufficient to survive Defendants' motion to dismiss.

## G. DECLARATORY JUDGMENT.

CLP seeks the Court's declaratory judgment that: (1) Casla, Hines, and Rochwerg were agents of the Principal Investor Defendants and the Principal Casla Defendants; and (2) Casla is an alter ego of the Principal Investor Defendants.

---

[186] *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 430 (Del. Ch. 2007).

[187] *See* Am. Compl. ¶¶ 184, 254-263.

[188] *See id.*; *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *27-28 (Del. Ch. Nov. 26, 2014) ("If the Plaintiffs can implicate these defendants in a fraud, they obviously have a remedy at law in damages.").

## 1. CLP Has Adequately Alleged Its Agency Theory.

Defendants argue that CLP fails to allege a basis to hold the Principal Investor Defendants and the Principal Casla Defendants liable for Hines, Rochwerg, and Casla's purported misconduct under an agency theory. In evaluating a claim under an agency theory the factual inquiry includes whether: "(1) the agent ha[s] the power to act on behalf of the principal with respect to third parties; (2) the agent do[es] something at the behest of the principal and for his benefit; and (3) the principal ha[s] the right to control the conduct of the agent."[189]

Due to the fact-intensive nature of the claim, whether a party was acting as an agent should not be decided on a motion to dismiss.[190] "The standard in Delaware is notice pleading."[191] And CLP has met this standard.

As outlined in the Amended Complaint, Casla, Rochwerg, and Hines were acting as the agents of the Principal Casla Defendants and Principal Investor Defendants because of the control exercised by the Principal Casla Defendants and the Principal Investor Defendants over Casla and ABS.[192] Principal Casla

---

[189] *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *11 (Del. Ch. Sept. 2, 2008) (alterations in original) (quoting *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 169 n.30 (Del. Ch. 2003)).

[190] *EBG Holdings LLC,* 2008 WL 4057745, at *11 (Del. Ch. Sept. 2, 2008).

[191] *Carlyle Investment Mgmt. L.L.C. v. Moonmouth Co. S.A.*, 2015 WL 5278913, at *14 n.75 (Del. Ch. Sept. 10, 2015) (citing *Cent. Mortg. Co.*, 27 A.3d at 536)).

[192] Am. Compl. ¶¶ 13, 21-29, 50.

Defendants and Principal Investor Defendants all owned a significant controlling interest in Casla, the entity that owned ABS, and/or were members or representatives on Casla's board of directors. So, they controlled the operation of both Casla and ABS.[193]

CLP has sufficiently alleged that the Principal Casla Defendants and Principal Investor Defendants, therefore, had the right to control Casla, ABS, and ABS's management. This management included Rochwerg and Hines who were working out of ABS's offices and managing ABS on a day-to-day basis.[194]

Further, CLP alleges Casla, Rochwerg, and Hines had the power to act, and in fact did act, both on behalf of the Principal Casla Defendants and Principal Investor Defendants and at those Defendants' direction when managing ABS and when defrauding CLP.[195] CLP claims the Principal Investor Defendants and Casla Partners, L.P., are liable based on their fraudulent conduct, rather than solely by reason of their being a member or manager of Casla.

CLP has adequately alleged its agency theory. However, as stated before, Casla Partners LLC is dismissed from this claim for lack of personal jurisdiction.

---

[193] *Id.*

[194] Am. Compl. ¶¶ 24-25, 50.

[195] *Id.* ¶¶ 24-25, 50.

## 2. CLP's Alter Ego Theory May Be Viable.

Defendants argue that CLP has not plead specific facts supporting its suggestion that the Principal Investor Defendants and the Principal Casla Defendants should be liable under an alter ego theory. This alter ego theory of liability "allows courts to permit contractual [and tort] creditors to reach the assets of the owners of the entity based on a multi-factor test."[196] Appropriate circumstances for piercing the corporate veil are not limited to fraud, and include using the corporate form to contravene the law or commit a public wrong.[197]

Whether to pierce the corporate veil is a fact-intensive inquiry that requires the court to evaluate whether the owners of the entity unjustly misused the corporate form.[198] Some of the factors to be considered include: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant

---

[196] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012).

[197] *David v. Mast*, 1999 WL 135244, at *1-2 (Del. Ch. Mar. 2, 1999) (piercing the corporate veil where the defendant advertised that "an undercapitalized, massively indebted corporation that . . . had been 'winding down' for years and that had been 'discounted two years before August 1997' could guarantee its work for up to 10 years").

[198] *Id.* at *2-3.

shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder."[199]

CLP has alleged that the Principal Investor Defendants have an equity interest that totals more than 69% of the total equity interest in Casla, heavily participated in Casla's management as directors or representatives on Casla's board, worked closely with Casla in managing ABS, and directed themselves to be paid significant compensation from Casla's coffers.[200] CLP alleges that the Principal Investor Defendants ignored all corporate formalities with respect to Casla in their management of Casla and ABS.[201]

CLP also contends the Principal Investor Defendants used Casla solely as a risk-free investment vehicle with no regard for corporate formalities. For instance, CLP explained at length how Casla and the Individual Defendants defrauded CLP into paying an inflated price for ABS.[202] Then, immediately after this transaction, the Principal Investor Defendants decided to decapitalize Casla and transfer

---

[199] *See, e.g., U.S. Bank N.A. v. U.S. Timberlands Klamath Falls, L.L.C.*, 2005 WL 2093694, at *1 (Del. Ch. Mar. 30, 2005).

[200] Am. Compl. ¶¶ 26-29, 45.

[201] *Id.* ¶ 49.

[202] *Id.* ¶¶ 53-209.

essentially all of Casla's assets to themselves, knowingly leaving Casla unable to pay a judgment for Casla's fraud.[203]

Defendants argue that CLP fails to state a claim because the parties specifically agreed to what portion of the sale proceeds would be distributed and what portion would remain with the Seller Defendants to fund post-Closing obligations under Section 8.11 of the SPA. It is conceivable, however, that SPA Section 8.11 could be construed only as a representation from Sellers, and not a provision that CLP expressly acknowledged and accepted. Under the facts alleged in the Amended Complaint and allowing for the reasonable inferences drawn from those facts, the Court simply cannot say there is no reasonable conceivability that CLP might be able to obtain recovery on their claim for fraudulent transfer.

## H. CONSTRUCTIVE TRUST IS A POTENTIAL REMEDY.

"The doctrine of a constructive trust is based on the equitable principle that 'one who would be unjustly enriched, if permitted to retain property, is under an equitable duty to convey it to the rightful owner.'"[204] A constructive trust is not

---

[203] *Id*. ¶¶ 13-16, 43, 49, 184, 213-214.

[204] *Ciappa Constr., Inc. v. Innovative Property Resources, LLC*, 2007 WL 914640, at *1 (Del. Super. Ct. Mar. 2, 2007) (quoting *Hogg v. Walker,* 622 A.2d 648, 652 (Del. 1993)).

itself a cause of action but is instead an equitable remedy.[205] It is often a remedy for unjust enrichment, however it also can be a remedy for fraudulent transfers.[206]

CLP has alleged that Defendants: (1) are "wrongfully in possession of specifically identifiable property, namely the proceeds of the transaction, which in equity belongs to CLP"; (2) "knew its actions in obtaining this properly were wrongful, fraudulent, unfair, and unconscionable"; and (3) would be unjustly enriched at CLP's expense if Defendants are "permitted to retain the proceeds of the transaction."[207] In sum, CLP has pled sufficient facts in its fraudulent transfer and unjust enrichment claims to support the potential remedy of a constructive trust.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is hereby **GRANTED** as to all claims against the Non-Delaware Defendants for lack of personal jurisdiction and **DENIED** as to all other claims.

**IT IS SO ORDERED.**

*/s/ Paul R. Wallace*

_____

Paul R. Wallace, Judge

Original to Prothonotary
cc:    All Counsel via File and Serve

---

[205] *VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *6 n.60 (Del. Ch. Apr. 28, 2014).

[206] *See Duffield Assocs., Inc. v. Lockwood Bros., LLC*, 2017 WL 2954618, at *4 (Del. Ch. July 11, 2017).

[207] Am. Compl. ¶¶ 282-285.